LEONARD M. CROTHERS, Plaintiff-Appellant, *v.* LA SALLE INSTITUTE, Defendant-Appellee.

First District (3rd Division)   No. 59113

Opinion filed July 29, 1976.

Morrill, Koutsky, Chuhak and Upton, of Chicago (Lawrence T. Stanner, of counsel), for appellant.

Baker & McKenzie, of Chicago (Francis D. Morrissey, of counsel), for appellee.

Mr. PRESIDING JUSTICE MEJDA delivered the opinion of the court:

Plaintiff, Leonard M. Crothers, appeals from a judgment entered upon a jury verdict for defendant, La Salle Institute, a not-for-profit Missouri corporation, in an action arising from plaintiff's fall from the roof of defendant's gymnasium where he was working as an apprentice roofer. Plaintiff filed a two-count complaint, charging defendant with negligence

in one count and violations of the Structural Work Act in the other. (Ill. Rev. Stat. 1967, ch. 48, par. 60 *et seq.)* Plaintiff dismissed the negligence count prior to trial. The trial court denied plaintiff's post-trial motion for a judgment notwithstanding the verdict or, in the alternative, a new trial.

On appeal plaintiff contends that the trial court erred in the following:

(1) failing to direct a verdict or grant a judgment notwithstanding the verdict against defendant;

(2) failing to hold as a matter of law that defendant was "in charge of the work" within the meaning of the Structural Work Act;

(3) failing to submit plaintiff's tendered instruction defining the gymnasium roof as the scaffold which allegedly was in violation of the Act;

(4) excluding from evidence a letter written by defendant's agent to plaintiff's employer;

(5) denying plaintiff's motion *in limine,* as well as a later motion for a mistrial, to exclude reference to defendant as a not-for-profit corporation; and

(6) not granting plaintiff a new trial on the ground that the verdict was contrary to the manifest weight of the evidence.

We conclude that the judgment must be reversed and the cause remanded for a new trial due to errors in the instructions and the improper exclusion of evidence. The pertinent facts follow:

Prior to the presentation of any evidence plaintiff made a motion *in limine* that no reference be made before the jury to defendant as a not-for-profit corporation or as a religious organization. The trial court denied the motion. The case then proceeded to trial and the following evidence was presented.

Plaintiff testified: on July 27, 1967, he was employed by Norton & Sons Roofing as an apprentice roofer for approximately four months. For three or four days he had been working at a construction project on the campus of Lewis College, in particular, on the roof of a gymnasium. The only person who gave him orders at the job site was George Anderson, Norton's foreman. Although the structural steel portion of the gymnasium roof had been installed, skylights remained to be put in place and the insulation for the roof was to be installed. On July 27 the wind was gusting. Plaintiff was assigned to stuff insulation material into the cracks between sections of the steel roof. He began by working backwards toward the edge of the roof with his back to the edge. This enabled him to prevent the wind from blowing out insulation he had already laid. Wooden boards were scattered around the roof to prevent other insulation from being blown away. As he neared the edge a gust of wind threw plaintiff off balance, causing him to fall over the edge onto a

concrete landing some 35 feet below, sustaining severe and permanent injuries.

Edward Stephenson, a safety inspector for the Illinois Department of Labor, testified on behalf of plaintiff. He supervises State inspectors who police the safety of construction projects in Illinois. When improper safety measures are found his department has authority to order construction stopped until appropriate measures are implemented. He was familiar with the customary safety practices in Will and Cook Counties in 1967. Where men are working on a flat roof, perimeter butting is the customary safety method for protection from falling. This can be accomplished in a variety of ways; safety belts with lead lines given to the men; use of safety nets; and by the use of imbedded pins and uprights or welded uprights connected by ropes or cables. Ladders can also be extended up to the roof and connected with lines of some kind. In some instances, merely ropes with streamers attached can be used as an appropriate warning to workmen. Stephenson also testified that it was the custom of the industry to use one or more of these safety devices to protect men working on a flat roof.

On cross-examination Stephenson stated that a safety device considered appropriate for a particular building under construction would depend upon the physical layout of such building. He admitted that he did not know the physical layout of defendant's gymnasium. He added, however, that a perimeter rope with streamers would be the least desirable if any of the other devices were available.

Robert Messer was called by plaintiff as an adverse witness. He had been chief estimator for the Paxton Construction Company at defendant's project. Paxton had been hired as the general contractor. Messer's function for Paxton was to evaluate costs and answer questions for the subcontractors as to the intent of the architect's plans. He stated that defendant subsequently dismissed Paxton as the general contractor and he was then hired by defendant to work as its project manager. His function for defendant was to evaluate costs and answer questions of the subcontractors if they had difficulty in interpreting the architect's plans. He had nothing to do with the manner in which the construction was carried out, and the methods of doing the work were left to the various subcontractors. He only interpreted the plans and inspected work to insure that defendant was getting its "money's worth." His approval, as well as that of the architect, was necessary before defendant made payment to a subcontractor for completed work. Messer was the only person at the project to schedule the subcontractors by informing them of the progress of the construction and when to come to begin their particular part of the work. Although the architect was not on the job site

at all times, the final interpretation of the plans and the final determination of conformity of the work with the plans was left to the architect.

Brother Joel Damian was called by plaintiff as an adverse witness. He was the legal equivalent of a corporate secretary to defendant. Defendant was a not-for-profit Missouri corporation licensed to do business in Illinois, and had contracted with Paxton Construction Company to erect several buildings on the campus of Lewis College. Paxton was the general contractor and he in turn engaged the various subcontractors on the project. Subsequently, the architect informed defendant that Paxton was not performing satisfactorily, and defendant then dismissed Paxton. Brother Damian wrote to the subcontractors and asked them to continue work under the same terms as in their contracts with Paxton. Each of them agreed to complete work in accordance with the former terms. Defendant did not enter into any new agreements with the subcontractors. Following the dismissal of Paxton there was no general contractor for the project although defendant did hire Robert Messer, previously employed by Paxton. The method of performance of the work was left to the subcontractors and this included the question of whether scaffolds were needed. Messer's duties were to inspect the final product and coordinate the trades only to the extent of informing them the work was at a certain stage of completion and that they should come onto the job at a certain time. Brother Damian denied that Messer was the supervisor of the construction and stated that the architect had the responsibility of supervising the subcontractors. He stated that although Messer attended weekly meetings of the subcontractors at which the status of the work was reviewed, Messer merely coordinated the trades. He admitted, however, that he had referred to Messer as the "superintendent of the project" in a letter to the subcontractors advising them of Paxton's dismissal as general contractor; the Messer's function was in reality that of a job inspector whose duties were to help individual subcontractors keep the project going, and that "project director" was a more accurate description of his position. The witness stated that no Christian Brother had anything to do with the day-to-day supervision of the construction; further, that if the plans were to be changed or the work stopped for any reason, it was the architect who would have that responsibility. He finally testified that the work of the subcontractors was subject to the approval of both the architect and Messer before defendant would make any payment.

At the conclusion of Brother Damian's testimony plaintiff moved for a mistrial because the witness had referred to defendant as a not-for-profit corporation. The trial court denied the motion. In closing his case-in-chief, plaintiff moved that the trial court hold as a matter of law that defendant was in charge of the construction within the meaning of the

Structural Work Act. The trial court denied the motion, as well as subsequent motions for directed verdicts by both plaintiff and defendant.

Defendant did not present any evidence; however, prior to the formal closing of defendant's case, plaintiff moved for leave to introduce a letter from Brother Damian to Norton & Sons Roofing advising that Paxton had been dismissed as general contractor. Initially, defendant objected that introduction of the letter at that time would be prejudicial, but the trial court overruled the objection. Defendant then objected that the letter would be merely cumulative evidence of Brother Damian's previous admission that he had once referred to Messer as the superintendent of the project in letters sent to the subcontractors. Plaintiff argued that the letter was not cumulative because it was addressed to "the issue of the case as to who was in charge of the construction." The objection was sustained as cumulative by the trial court. Plaintiff's counsel then made an offer of proof. In making a formal offer of proof, he stated, "the letter, of course, will speak for itself, which indicates that he's [Messer] not the job inspector, but that he's superintendent of the project as characterized by Brother Joel Damian."

The letter in question, included in the record as Plaintiff's Exhibit No. 34 for identification, states in pertinent part:

"November 21, 1966

Norton & Sons Roofing
610 W. 76th St.,
Chicago, Illinois

Gentlemen:

This is notification that the Christian Brothers have decided to discontinue the services of Paxton Construction Company and to handle the details of completing certain projects on the campus of Lewis College under their own direction. These are: * * * Scholasticate Building (including a gymnasium addition * * *).

Mr. Robert Messer has been hired as superintendent of the project. Mr. Clare Wallace will continue as supervisor of The Drake Partnership, architect.

Please furnish to me at the above address full evidence of your interest in these projects, separately—copy of contract or purchase order from Paxton indicating authorized additions and deductions, date and amount of each progress billing to date, and amount of each payment received to date.

A new purchase order will be issued by the Christian Brothers upon verification of the status of your agreement with Paxton, as well as an indication of willingness on your part to participate under the new circumstances.

I expect that we will be able to continue the projects in good. order.

Very sincerely,
Brother Joel Damian, FSC"

Thereafter, a conference on instructions was conducted. Plaintiff's Instruction No. 5 was tendered, based upon Illinois Pattern Jury Instruction, Civil, No. 180.14, and stated:

Elsewhere in these instructions I have used the term "violation of the Structural Work Act." The statute was violated if the *roof* in question was not safe so as to give adequate protection to the life and limb of any person employed thereon and the defendant knew of the condition or, in the exercise of ordinary care it could have discovered it.

Defendant objected to the instruction on the basis that it held the gymnasium roof to be a scaffold as a matter of law within the meaning of the Act, whereas such determination was a question of fact for the jury to determine. The trial court sustained the objection and refused to submit the instruction to the jury. Thereafter, the jury returned a verdict for defendant and judgment was entered. After the denial of his written post-trial motion, plaintiff instituted the present appeal. We proceed to a consideration of those contentions raised by plaintiff which must necessarily be addressed.

■■ Plaintiff first contends that the trial court erred in failing to direct a verdict or grant a judgment notwithstanding the verdict against the defendant on its liability under the Structural Work Act. Plaintiff also contends that the trial court erred in failing to hold as a matter of law that defendant was in charge of the work within the meaning of the Act. These contentions are interdependent. The trial court could not direct a verdict or enter a judgment notwithstanding the verdict on defendant's liability under the Act unless it could also hold as a matter of law that defendant was in charge of the work. As we conclude that the trial court was correct in denying plaintiff's motion to hold defendant in charge of the work as a matter of law, plaintiff's initial contention must also fail.

Section 9 of the Structural Work Act (Ill. Rev. Stat. 1967, ch. 48, par. 69) provides in part:

"Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this act, shall comply with all the terms thereof, * * *.

\* \* \*

For any injury to person or property, occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby; * * *."

Before liability may be imposed upon a defendant under section 9, it must be established that the defendant had charge of the operations involving the alleged violation of the Act. (*Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.* (1961), 22 Ill. 2d 305, 175 N.E.2d 785.) It has been held that the language "in charge of" is a generic phrase of broad import. (*Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 211 N.E.2d 247.) However, in cases such as the instant one, where an owner is sought to be held under section 9, the owner must have had some direct connection with the work out of which the violation arose, over and above mere ownership, inspection of the work, or the employment of an independent contractor. (*Gannon; Melvin v. Thompson* (1963), 39 Ill. App. 2d 413, 188 N.E.2d 497.) Whether the connections and activities in a given case are such that an owner can be deemed to have been in charge of the work is primarily a question of fact for the determination of the jury. *Voss v. Kingdon & Naven, Inc.* (1975), 60 Ill. 2d 520, 328 N.E.2d 297; *Larson.*

In the instant case, the evidence presented on the issue of whether defendant was in charge of the construction of the gymnasium was not conclusive as to either party. Plaintiff testified that only George Anderson—Norton & Sons' foreman—gave him orders at the job site. Robert Messer testified that the manner in which the construction was to be performed on the project was left to the various subcontractors. He stated that he merely evaluated costs, answered questions as to the intent of the architect's plans, scheduled the trades as to when they should come onto the job, and approved work as completed before defendant made payment to the subcontractors. Brother Damian testified that Messer additionally attended weekly meetings with the subcontractors to review the progress of the work; that the architect had final responsibility if the plans were to be changed or the work stopped for any reason. Brother Damian stated, however, that after defendant dismissed Paxton Construction Company there was no general contractor on the project. The removal of Paxton left no other entity between defendant and the subcontractors. Brother Damian also testified that no new agreements were entered into with the subcontractors after the dismissal of

Paxton, but rather, the subcontractors were asked and in fact agreed to continue their work under the same terms as provided in their contracts with Paxton.

■■ Moreover, Brother Damian admitted to referring to Messer's position as the superintendent of the project in letters to all subcontractors. The letter sent to plaintiff's employer was the subject of an offer of proof at trial. Hereinafter we conclude that the letter was improperly excluded; therefore, we consider it instead as having been substantively introduced and received in evidence at trial. In the excluded letter Brother Damian advised plaintiff's employer that Paxton had been dismissed and defendant was now handling the details of completing the construction. We find that the conflicting nature of the evidence presented on this issue dictates a conclusion that it cannot be said no reasonable men could disagree that defendant was in fact proved to be in charge of the gymnasium construction as in the meaning of section 9 of the Act. Therefore, plaintiff's motion that defendant be held to have had charge of the work as a matter of law was properly denied. It follows that the trial court was also correct in refusing to enter either a directed verdict or a judgment notwithstanding the verdict for plaintiff on the issue of defendant's liability under the Act.

■■ Plaintiff contends that the trial court erred in failing to submit to the jury plaintiff's tendered instruction defining defendant's gymnasium roof as the scaffold alleged to be in violation of the Structural Work Act. Initially, defendant argues that plaintiff has failed to preserve that issue for review by not specifying in his written post-trial motion the grounds for his objection to the trial court's refusal to submit the instructions to the jury. Section 68.1 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 68.1) requires that a post-trial motion contain the points relied upon, particularly specifying the grounds in support thereof. In his post-trial motion plaintiff stated that the trial court erred in refusing to give Plaintiff's Instruction No. 5 and thereafter set forth the instruction verbatim. It has been held to be sufficient to preserve error in the giving or refusing to give an instruction to state that the trial court erred in regard to the instruction and to identify or set it forth verbatim. (*Tabor v. Tazewell Service Co.* (1958), 18 Ill. App. 2d 593, 153 N.E.2d 98.) This plaintiff has done and the contention is properly before this court.

Plaintiff's Instruction No. 5 was based upon Illinois Pattern Jury Instruction (Civil) No. 180.14 which sets forth:

"**180.14 Violation—Definition**

Elsewhere in these instructions I have used the term "violation of the Structural Work Act." The statute was violated if the [scaffold] [hoist] [crane] [stay] [ladder] [support]

[_____]
 other mechanical contrivance or device

in question was [placed] [used] [operated] [in a condition] [in a manner] [under circumstances] that [was] [were] not safe so as to give adequate protection to the life and limb of any person [(employed) (engaged) thereon] [passing under or by it] and the defendant(s) knew of the [condition] [manner of (use) (operation)] or, in the exercise of ordinary care, [he] [it] [they] could have discovered it."

Plaintiff prepared Plaintiff's Instruction No. 5 by simply modifying the pattern instruction with appropriate wording to fit the facts and theory of his action. In the space for the contrivance or device which would bring the injury within the ambit of the Structural Work Act, plaintiff inserted the word *roof*. Defendant objected to the instruction on the ground that it held in effect that the gymnasium roof was a scaffold as a matter of law rather than a question of fact for the jury to determine. The trial court sustained the objection and refused to submit the instruction. We hold that in so doing, the trial court erred.

■■ On an almost identical factual setting in *St. John v. R.R. Donnelley & Sons Co.* (1973), 54 Ill. 2d 271, 296 N.E.2d 740, the Supreme Court decided that a roof which was under construction could be a scaffold as a matter of law. There, two workmen had fallen through a hole in a roof under construction, the holes having been intentionally left for the later installation of ventilation equipment. The court held that it was clear the roof was being used as a platform for the workmen, and that the factor of the roof being intended as a permanent part of the building was not relevant as it was being put to temporary use as a scaffold and therefore was within the Structural Work Act. In arguing that whether the roof was a scaffold was a question of fact for the jury, defendant cites *Spiezio v. Commonwealth Edison Co.* (1968), 91 Ill. App. 2d 392, 235 N.E.2d 323. We find *Spiezio* to be distinguishable. There, the court was presented with a factual question of whether a workman was on a device that was to provide him with temporary support within the ambit of the Act. The court held that the factual resolution depended upon a determination of whether it was the intention of the parties that the device was to be utilized as a temporary support. In the instant case, however, there is no dispute that the gymnasium roof was intended to provide support for plaintiff and the other workmen. There is no evidence of record that the roof was not intended to be so utilized. Indeed, as in *St. John,* using the roof as a support for his work of installing insulation was all the plaintiff could practically do. Here, as there was no dispute of fact as to the use to which plaintiff had put the gymnasium roof, he was entitled to have the jury instructed that the roof was a scaffold within the meaning of the Structural Work Act.

Defendant also argues that Plaintiff's Instruction No. 5 was not in conformity with the allegations of the complaint, and further, that plaintiff's other given instructions adequately advised the jury as to plaintiff's theories of liability and the law. Neither argument is persuasive. First, plaintiff's complaint alleged that defendant violated the Act in that it "willfully failed to erect, construct, place in a safe, suitable and proper manner a guard rail, net, warning signs, horses, barricades or scaffolds so as to give adequate protection to the life and limb of any person or persons employed or engaged thereon." It suffices to say that the failure to provide a safe, suitable and proper scaffold would also encompass the providing of an unsafe, unsuitable and improper scaffold, namely, the gymnasium roof. Second, the other instructions submitted to the jury did not adequately advise them of this particular theory of plaintiff's case. No other instruction given to the jury stated that the gymnasium roof could be a scaffold within the meaning of the Structural Work Act. The jury thus deliberated without being informed of one of plaintiff's theories of liability which found support in the evidence.

Plaintiff next contends that the trial court erred in excluding from evidence a letter written by Brother Damian to plaintiff's employer. The letter was rejected by the trial court on the basis that it was cumulative of Brother Damian's prior testimony wherein he admitted that he had referred to Robert Messer as "superintendent of the project" in letters he had written to all subcontractors. Plaintiff contends that the letter should have been substantively admitted to demonstrate that defendant was in charge of the construction of the gymnasium. Defendant, however, argues that plaintiff has not preserved the issue of the substantive introduction of the letter. Defendant argues that in his offer of proof plaintiff's counsel stated that the letter was being offered to show that Messer was not the job inspector, but rather, the superintendent of the project as characterized by Brother Damian. Thus, defendant asserts that the offer of proof was limited to the ground that the letter would impeach Brother Damian, and since Brother Damian had already admitted he had so referred to Messer, the letter as limited by the offer of proof could only be cumulative of Brother Damian's testimony.

■■ Defendant has isolated one remark of plaintiff's counsel to support its argument, but when read in the context of the entire discussion concerning the admissibility of the letter, that isolated remark takes on a different meaning. Shortly before making the remark to which defendant gives emphasis, plaintiff's counsel had stated that the letter "says in effect that which concerns the issue of the case as to who was in charge of the construction." A fair reading of all the remarks plaintiff's counsel made on the subject indicates that the letter was being offered substantively on the issue of whether defendant was in charge, rather than merely as a means

of impeaching Brother Damian. We find that plaintiff has properly preserved the question of the substantive exclusion of the letter from evidence. Moreover, we further find that the trial court erred in excluding the letter as cumulative evidence. The substantive introduction of the letter was crucial to a portion of plaintiff's burden of proof; that is, whether defendant was in charge of the gymnasium construction and therefore liable for wilful violations of the Structural Work Act. The letter, in addition to referring to Messer as the superintendent of the project, states that defendant itself will handle the details of completing the construction. The letter thus represented possibly the strongest evidence available to plaintiff that defendant was in fact in charge of the work. Its exclusion from evidence was error which operated to the obvious prejudice of plaintiff's case.

■■■ Plaintiff next contends that the trial court erred in denying his motion *in limine* as well as a later motion for a mistrial. Both motions were predicated upon references to defendant at trial as a not-for-profit corporation. Initially, plaintiff made his motion *in limine* to prevent all references to defendant before the jury as either a not-for-profit corporation or a religious organization. The motion was denied. In doing so, the trial court was exercising its discretion over the conduct of trial and its determination cannot be disturbed on review in the absence of an abuse of such discretion. (*Sherman v. City of Springfield* (1969), 111 Ill. App. 2d 391, 250 N.E.2d 537.) Here, there was no abuse of discretion. Section 5 of the Illinois General Not for Profit Corporation Act provides that a not-for-profit corporation is empowered to "sue and be sued, complain and defend, in its corporate name." (Ill. Rev. Stat. 1973, ch. 32, par. 163a4(b).) Plaintiff's complaint stated that the action is brought against "LaSalle Institute, A Not-For-Profit Missouri Corporation." Thus, not only has plaintiff so designated defendant in his pleadings, but defendant had the right to defend in its corporate name, and in particular, as designated by plaintiff. Plaintiff does not complain of any instances in which defendant was referred to at trial as a religious organization. The foregoing reasons also apply to plaintiff's argument that the trial court erred in not declaring a mistrial after Brother Damian had referred to defendant as a not-for-profit corporation. The determination of whether a mistrial is warranted is within the discretion of the trial court. (*Stuart v. Rahn* (1974), 16 Ill. App. 3d 315, 306 N.E.2d 66.) We find no abuse of discretion in the denial of plaintiff's motion for a mistrial. Moreover, the record indicates that Brother Damian's reference to defendant's status was invited by plaintiff's counsel in his preliminary examination of Brother Damian when called as an adverse witness.

For the reasons stated, it is not necessary to reach the contention that the court erred in not granting a new trial on the ground that the verdict of

the jury was contrary to the manifest weight of the evidence. The judgment of the circuit court of Cook County is reversed and the cause remanded for a new trial not inconsistent with this opinion.

Reversed and remanded.

McNAMARA and McGLOON, JJ., concur.